Good morning, Your Honors. May it please the Court, my name is Hussain Safori, and I represent Patrick and Nelda White, the appellants in this case. I'd like to reserve five minutes for rebuttal, please. Your Honors, what's unfortunate in this case, I believe, is that the Court below reached a predetermined conclusion in its ruling without really paying close regard to the allegations in the First Amendment complaint. It pigeonholed this case as one of many that the Court below has seen since the subprime crisis, where lenders allege they were told a modification would be considered and then wasn't. And there are many — and in those cases, there is significant precedent that says, well, telling a lender or a borrower that a modification would be considered does not give rise to a cause of action for misrepresentation. What's different here is that the First Amendment complainant, Mr. and Mrs. White, were told that they had, in fact, qualified. They were told on the phone that they had, in fact, qualified for a modification. That's in the First Amendment complaint at pages 3, it's at page 6. And moreover, the First Amendment complaint also alleges that they were told the terms of the modification. So they were told they had qualified, they were told the terms three different times in terms of 13. I'm looking at the first promise, which would be paragraph 13. In their allegation, the Chase representative stated the Whites were eligible, I see that, based on information supplied by Mr. White, qualified for a loan modification. Then two sentences later, your complaint says the Chase representative stated that the only step was to verify the oral statements of Mr. White. I mean, that suggests that there's additional work to be done. It doesn't say it's been done. It says if everything looks like it's in order as you have represented it to us on the phone, then you're going to get this loan. But that's not the same as saying I've looked at all the paperwork and you got it. Right, Your Honor. I think that now we're getting beyond the allegations and getting into evidentiary issues. What was, in fact, said on the phone? If the representative said, as it says, they at line 16 of paragraph 13, that they qualified for a loan modification, and then told them you're going to get paperwork to fill out to confirm this, that suggests that the paperwork is pro forma at this point. It's, it's not. I don't know. I think anybody who's been around and bought a house or two has had a lot of anxiety right up to the last moment as to whether everything's going to go through. Right. Well, but what it also alleges that they submitted the paperwork and a significant amount of time later, they were told after the first promise that the loan, first loan modification wasn't going to happen. Yeah, that's presumably why you submit the paperwork. So then you can figure out whether you in, whether you in fact have qualified. Right. And then, Your Honor, then they are told it again. And then they're told it a third time. We get to the third promise. And again, that alleges that, see, the allegation is that they're told they were, not only that they were eligible, but they were, they were also told that they had qualified. And they were, But qualified could mean, you know, I, there are lots of times I get, I get, I get anonymous phone calls that are very, very annoying that say, you know, congratulations, you qualified for a, you know, Caribbean cruise. Well, it turns out there's going to be a catch someplace. So even though I'm qualified for it, it doesn't mean that I just got one free. Right, Your Honor. I, that's, that's, I think in the way that we use that term in ordinary conversation, it, it doesn't tell you very much. And particularly where in your own complaint, you've acknowledged that they were going to have to submit additional paperwork. That is not the same as saying, I got all the paperwork, we're closing on, on Thursday. Your Honor, what that suggests to me is, in fact, wasn't that the reason why the district court denied leave to amend, because, you know, these statements were qualified? No, I, I think, I think he called it conditional. That's right, Your Honor. And so, right? The district court did say that these were conditional. I, I think, however, it ought to be grounds for leave to amend to specify more clearly what was in fact said. Well, what could you specify more clearly? Still, I mean, you, you can't avoid this, you know, this provision that, you know, they still had to do more paperwork, right? Your Honor, if they were told that the paperwork is... Oh, you've alleged what they were told, but... Yeah. Well, we don't allege that they were told that it was a formality, that yes, you've qualified, you're in the program. How can you amend it? Let me put it this way. What can you allege to get around the fact that, you know, a reason for not granting your leave to amend it because it would be fueled because all these statements were qualified? Conditional? If they were told by the representative on the phone that, based on what our, our conversation, all the information you provided me, you have qualified. You just need to put it in writing and send it in, but it doesn't, it's not going to alter it. What you, so long as what you put in writing is what you've told me on the phone, you've got your modification. That's not conditional because they've already been told... And is that what, if you had a chance to amend the complaint, is that what you would say? Yes, Your Honor, that is what we would say. That is what they were told. They were told that based on the information they provided on the phone, they did qualify. And that the paperwork, so long as the paperwork matched what they said on the phone, so long as they weren't making it up on the phone, the paperwork wouldn't change anything. And I, they ought to be allowed to amend to allege that, because that is, in fact, what they were told. So it wasn't really conditional. The paperwork was not going to change. If it matched what was said, it wasn't going to change the promise that was made. You say the promise. Does your complaint specifically allege that if the paperwork matched, the loan will be funded? Judge Bybee's question about the allegations in the complaint that your folks were told they were qualified and eligible, help me understand how that would get you over the justifiable reliance. In other words, somebody may be qualified for something, but that's not necessarily a lender saying, and we're going to fund the loan. Do you affirmatively allege that the bank promised that it would close the modification if the paperwork matched, or simply that the bank said it was eligible, that your clients were eligible? Well, the, it alleges that they were told not only that they were eligible, that they had qualified. So we do allege that. What we haven't alleged is the detail to the loan. If they had qualified, you mean, you mean unconditionally qualified? Is that what you mean? Is that what you're trying to say, or you don't want to say that? What I'm trying to say is they were told that if the written information they sent in matched what they said on the phone, then they were qualified. But does that mean, and they would receive the loan? And they would receive the loan. Yes. That's what they were told. When you, when you interpret the word qualified, that's the way you interpret it is, we're done. Let's schedule the closing. We're done. And that's what you've, you've told us verbally in writing. If it matches, we're going forward. I mean, again, as somebody who's, who's bought and sold a couple of homes and, and, and had, you know, no small amount of anxiety over all of this, even when I've got somebody say, yeah, you were going forward with it, it's never done until it's done. I mean, there's just, there's just, I just know so many people who have gotten to the closing and had something, you know, paperwork missing, had something that wasn't there and, and, and had something botched, even though they were already told they qualified for the loan. Your Honor, I understand. I think that's, that's why it makes sense to grant leave to amend so that we can clarify exactly what was said. I mean, these are the allegations summarize what was said in those conversations and it raises questions which can be answered in an amended complaint that, that gives, that alleges what was actually said. I will say, I will say counsel that, again, I am drawing on a little bit of personal experience here, but I'm trying to draw on just a little bit of common sense that I hope I can be indulged in doing. But it seems very odd that somebody would get a call on a transaction this large and on simple conversation over the phone would be told it's a done deal. That, that just doesn't, that, that just doesn't square with the way that I think that most businesses conduct themselves and, and especially in the real estate market and especially in a volatile market where there's been a lot of slippage. Your Honor, I think that at the time, after the, the financial meltdown, after the, the subprime crisis, you had many lenders, borrowers, like my clients who were extremely stressed in a position where their, their income was gone and they were relying, they were aware that the government had put in place programs to help them and that their lenders were reaching out pursuant to those programs to help them be able to keep their homes. And they were relying on what their lenders were saying. I know that, that for a rational economic actor, it might not make complete sense, but I think that what we've seen and the reason that the courts have been flooded by so many of these cases of borrowers who were in trouble and relied on their lenders, the reality is that regular folks out there who are hoping to keep their homes were putting trust in what their banks were telling them. Does your argument depend on how the court interprets the word eligible or qualified? I mean, if you can't, you, I don't know that you're going to be able to say a whole lot more than what you've said, because you keep using the word qualified, that they were qualified. That's, I take it that that, that is the word that the whites believe that the person on the other end of the phone call from J.P. Morgan said was, you are qualified. I mean, they didn't, was there other language that you're going to be able to allege besides the word qualified? I think that what we could allege is what, what more was said to explain what qualified meant, because I think there's a difference between you're eligible and you're qualified. That would, that would be a matter of interpretation. If you can't, if you, if there's no record verbatim of this conversation or the whites don't have a distinct conversation of words that were used other than the word qualified, that, that may be unfair to plead that, if you can't, if you can't possibly prove that. But if you're going to use the word qualified and then say, well, this is the way the whites understood it, then does the court have to make a judgment of law as to what the word qualified means in a phone conversation? I think, I think the Court does, but at this stage where we're interpreting the pleadings, I think the Court has to draw inferences in favor of what is being pled. Well, I'm certainly willing to draw the inferences as to what the whites believed the word qualified meant. Does the Court at any point have to decide that the word qualified doesn't mean you win? You're alleging fraud here. That's a, that's a, that's a very, very serious charge, even in, even in a civil context. And if somebody tells me on the phone, you have qualified, I'm, I might, I might take, you know, I might take some inference from that, and maybe that's a reasonable inference and maybe it's not. And I'm just wondering at what point does the Court get to say, we think qualified means this, but not that? Your Honor, I think that, that, at that point we're into evidentiary issues and, and what, how the word was used in that context and what else was said surrounding it and what it meant in that, in that particular instance. And what more, what more do you have to plead about what was said surrounding that, since there's no transcript of the, of the, of the conversation on either side that we know of? Ultimately, Your Honor, I think there would be a transcript. These were recorded conversations. My clients just don't have access to them. If the case goes forward, then everybody will be relying on those particular, on the exact transcripts and the recordings. At this stage Do we, do we know that those tapes still exist? I don't know that. I know my clients were told that they were being recorded, that the conversations were being recorded. And what, what my clients can do is, is based on their recollections, and I'm, I am aware of this, they said there, there is more detail that they can add to what was said in these conversations. Did you tell the district court what the additional detail specifically was? In other words, did you say to the district court more than just, please give me another shot at amending, but if you let me amend, I will specifically allege A, B, C, and D? No, Your Honor. We did not have that opportunity. And I think that that further militates in favor of being allowed to amend, because this is not a situation where the district court was told, here's what more we could say, or the district court said, you can amend, but here's what you need to tell me, and we weren't able to do that. If that were the case, I could understand not being able to allow, not being able to amend further, but we never had that opportunity. I assume the, the lenders moved for, to dismiss under 12b-6, and you responded, right? Correct, Your Honor. Did you say, and if you, our, our claim is sufficient, but court, if you disagree, please let us amend, and if we amend, we'll say this, or if you disagree, let us amend? We asked for leave to amend, but we did not specify what, what more we could say, Your Honor. But for some reason, Judge Englund found that amendment would be futile, right? Found that amendment would be futile, but I, I think that there is additional detail that can clarify what was promised to them in those phone conversations. Mr. Seforia, I know you were trying to reserve some time. We've taken quite a bit of your time. We have, you have consumed all of your time, but I am going to afford you two minutes for, for. Thank you, Your Honor. Good morning, and may it please the Court. Joseph Poppin, appearing for Appellee J.P. Morgan Chase Bank, and A, I will present argument for 7.5 minutes, and then my colleague will present the remainder of the time on behalf of her client, SPS. The lower court. You know, I, I think the real issue is, are you opposed to granting the plaintiff leave to amend? Absolutely. Give us the reasons. You think it would be futile, I assume. It would be futile for the reasons, I believe, Your Honor identified in the earlier argument, and two things about that. Mr. Seforia represented that they did request leave to amend in their opposition brief. That's false. They did not. And the second thing is, is he didn't identify any new facts that he would allege to remedy the conditional and contingent nature of the statements that have been alleged to support his fault. Well, I don't know if it's a new fact. I don't know if it's a new fact, but I assume from what he said, he would be able to allege that, and they were told that they were unconditionally qualified. That would get around Judge England's problem, wouldn't it, that it was conditional? Two things. I don't think they were prepared to, from my understanding of his argument, I don't think he said that. But assuming that that's they were prepared to allege that, even though that's, you know, not something that they put in their opening brief or their reply brief or were coming in today shouting that they were going to allege, that doesn't get past, I think, part of what Judge Bybee was getting at as to the expressed understanding that this whole conversation was subject to a later process of submitting financial documentation for review and approval by Chase. So a statement of qualification made on a telephone conversation. Let's stick with what we have here as well, is the statements of qualification and eligibility, as alleged, were made based on Mr. White's statements of their income and expense. So there's no further representation other than, well, based on what you're telling me about what you make, you qualify and are eligible at most. And they concede that they knew that they had to submit documents for verification. Just a little bit of an aside. Do those tapes still exist? In my, well, I don't know. I can't say. In my experience with my client tapes, this far back, I think six or seven years, would not. But the full answer is you don't know. The full answer is I do not know. So the statements of qualification or eligibility in and of themselves are self-evidently not statements of a guarantee or an unconditional promise to give a loan modification under California law. We've cited Conrad and a number of other cases that support that very clear and common sense semantic proposition. Furthermore, combined with the fact that the statements were based on Mr. White's oral statements and that they expressly knew that there was a subsequent process that they would have to undergo to submit their documents for review and approval by Chase, they couldn't, the statements are themselves shown to be provisional and contingent in nature. Don't they effectively allege, and I may be mistaken here, that even if there was a condition attached, that they fulfilled the condition, that they submitted paperwork that verified what Chase wanted to verify? So even if there was a condition, they satisfied it? Well, the point of submitting financial documents would be for the bank to determine whether or not, in its own right, it matches up with what they've alleged or what they stated what their oral income was. So at that point, you're far beyond any dealing with whether the statement itself was true or false. You're dealing with future action. I mean, I'm not sure if I answered your question. I understood you to be saying this was purely conditional. Nobody could rely on it. But if the condition was satisfied, I mean, if they knew they could satisfy the condition I don't think, well, I don't think that the allegation is set up to be just send in documents and then you get it, all right? I mean, I mean, if you look at it, it says, you know, if the if the income and expense statements by Mr. White, his oral statements, are supported by your financials, then you get a loan modification. It's not just you just send in the financials. And that is, I think, an implausible idea just to say, well, you get it as long as you just send in this document. But it's also not what's alleged here. So I direct the court to the Cruz versus the Bank of America opinion as well, because that and Conrad both involved pre-application statements where the court said, look, you, these are statements before you've been applied. They can't constitute a false statement of fact or a false promise. And, in fact, because you knew that there was a subsequent review process, you can't establish reasonable reliance as a matter of law because you understood that it wasn't a guaranteed thing. Regarding leave to amend, which I'll move to. But you say it's not a guaranteed thing. I keep coming back to this. If the condition is one that we know we could be satisfied, isn't it effectively a guarantee? If you said to us, I'll take the three of you out to lunch if you can prove to me that you are Federal judges, we could do that. That wouldn't in any real sense be conditional. We could reasonably rely on that, couldn't we? I mean, the analogy is in opposite to what they've alleged here. I mean, the bank had to review the documents, and if they – if the bank determined that the documents supported the oral statements, that's the condition. The condition isn't just send in the documents. I really reject the analogy. I'm not saying it's send in the documents. Isn't the allegation here, and maybe it's not, that we sent in documents that confirmed the numbers that Mr. White gave? Aren't they saying they satisfied it or no? Well, there's no allegations that – about any of the amounts that were represented initially. I mean, I think that they allege that – they admit that they had been unemployed at all times since 07 or something like that, but I mean, that's not even part of what this case has ever been about. They've never said, well, our financial documents matched 100 percent of the oral statements that we made. I mean, they don't identify what they said they made, and they don't identify the documents that they sent in. It's just really not part of their case. It's certainly not as pled, not as argued in the briefs or by counsel in opening arguments. So I don't think that your – I understand your analogy. I just don't think it's appropriate for this case. Briefly, on leave to amend, they argued in their opening brief the only argument was that promissory estoppel should be – they should get leave to amend to allege whether HAMP applies. HAMP doesn't apply as a matter of law because the loan exceeds the maximum amount a HAMP loan can have, which is $725,000 or about, and their loan is $1.35 million. And there – I'll just say, before I turn it over to my colleague, that the fact that that's the only amendment they've proffered, and we've heard today that they don't have any new facts that they're going to allege, nor facts that could change the conditional nature of these representations, only speaks to the truth of the lower court's ruling, that it's – it was futile to even grant an amendment. It's been established because we've been through briefing and now we've been through argument. Thank you, and I'll turn it over to counsel for us here. McClendon. Good morning, Your Honors. May it please the Court. My name is Regina McClendon, and I'm appearing on behalf of Select Portfolio Servicing. I'd like to start by addressing the leave to amend issue that the Court has raised. And I want to reiterate that the Whites never asked for leave to amend below. It is nowhere in their papers, and there was no hearing on the motion, so they didn't ask for it at oral argument. They never requested it. The leave that they asked for in their opening brief here was very limited. It's not to make the allegations that Mr. Sifori was referring to in his oral argument this morning, but rather it was a very limited leave to amend that they requested in their opening brief, and that is leave to amend to assert that HAMP applies. And there – and I think that is a futile amendment, and there's no question that that's a futile amendment, because HAMP only applies to loans that are $729,000 and below. And there's no dispute, and there are allegations in the complaint that this was a $1.3 million loan. Secondly, the – Wait a minute now. You're saying that they asked leave to amend only with respect to the HAMP loan? Yes, Your Honor. In the Whites' opening brief on appeal, they only asked for leave to amend to assert that HAMP applies. They didn't ask for leave to amend to assert anything else, and that is a futile amendment. The second point I would make is they did already have a chance to amend. The complaint that was at issue and that was ruled on below was the first amended complaint. There was never any discovery done in the case, and all of the allegations in the case concern a conversation, a telephone conversation Mr. White had with each of the defendants. So he has and has had at all times all of the information needed to assert his best case, and he had a second chance to do it in that first amended complaint. So – And do you have audio tapes of these conversations with your client? My answer is the same as Mr. Poppins. I don't know. Because we didn't get to the discovery phase, we never went to our client to check on that. It's – I can tell you that any time I've had to pull them, it's very burdensome, so we don't typically ask the client to do so unless and until we get past the pleading stage. So I don't know. So because this was a first amended complaint, the Whites always had all of the information needed, and we have to assume, and I think Judge England correctly assumed, that because this was a first amended complaint, because they didn't request leave to amend, they had stated the best case they could. It wasn't a situation where they needed some discovery or they needed to ask questions. It was all information within their knowledge based on their phone calls. And so when looking at this, remember, it's an abuse of discretion standard, whether Judge England abused his discretion in denying leave to amend. And he didn't. He says specifically that it's futile. He looked at the issue. It's not as though he ignored it or forgot to address it. He specifically addressed it in his order. And it was appropriate for him to assume that given the nature of the allegations and the nature of the fact that this was information uniquely within the Whites' knowledge, and given that they had already amended, that they had stated their best case that they could. And then just to echo that point, the burden is on the appellants to say how the district court judge abused his discretion, and they haven't come forward with any evidence of that. The next point I would like to make is that if the Court was asking Mr. Sifori how he could amend, I disagree that that gets over the problem, and I don't think there's any way to ever avoid the fact that the Whites have alleged in their complaint and they allege it repeatedly, that they understood that all of the information provided was subject to verification. So that underscores that this was always conditional. But even if we could set that aside, there are other elements. Reasonable reliance is a big one. And the Daniels case, which I think is generally not a good case for my client, but there is some language in there that I think is really important and very helpful here, and that is that it is not reasonable as a matter of law for a borrower to rely on a representation about a loan modification or that he or she is going to receive a loan modification absent some discussion of the terms, namely the interest rate. But I would add also the total balance and the term. Is it 360 months? Is it 480? Kennedy, I'm sorry. What case is that? It's the Daniels case. It's cited in, I think, everyone's briefs. And I thought that there was some discussion. I'm looking at paragraph 14 of the complaint. Yes, Your Honor. In paragraph 14 of the complaint, I don't think lists loan modification terms. 14a says that the terms were going to be to reduce the interest rate to no less than 2 percent. What does that mean? Does it mean 2.1 percent, 3 percent, 4 percent, 5 percent, 10 percent? So without knowing what the interest rate was going to be, there was no way for the whites to know what the to even begin to calculate their monthly payment and know whether it was going to be affordable. There's no way a court can enforce a promise, a lender's promise to give a modification without knowing what the interest rate of the loan is. So how can, without knowing the interest rate, a court say, yes, you made a promise to give a loan modification, but I don't know what the interest rate is? That's simply not enforceable. The other terms, paragraph 14b, extend the amortization to a maximum of 480 months. Again, most mortgage loans are 30 years, so that's 360 months. So was it 360? Was it 480? Was it somewhere in between? Was it even less than 360? Because by this time, they were already several years into the loan. So without knowing the amortization, that makes the promise unspecific and unenforceable. And then item C of paragraph 14, forbear the unpaid principal balance by no greater than 30 percent so that the payment is no greater than 31 percent of monthly gross income. Again, that is not a specific term. No greater than 30 percent could mean anything from 0 to 29.99. So these are not specific loan modification terms, and they're not enforceable. And the Daniels case holds that you have to have specific terms specified in order to have an enforceable promise. And my timing was perfect. Just a minute, though. Daniels, you're talking about a promissory estoppel claim or what? Yes. It was the Daniels discussion on promissory estoppel. I believe it carries over to the fraud claim as well, because, again, if there is nothing specific promised, such as an interest rate, that can't be an enforceable promise. All right. Thank you. Thank you, Your Honors. Thank you, Ms. McClendon. Mr. Sifori. Judge Biby, something occurred to me sitting down there. To answer your question about the conditional nature of the promise, and it's this. Regarding loans, loans are effectively always conditional. Even when they've been made and they're being paid down, there is a condition that applies, and it's a condition that the information on which that loan was provided, based on which it was given, that was given by the borrower, is true. So effectively, this condition of verification is always there. It's always part of a loan, even after the loan has been disbursed, because if the borrower determines that the information provided on which the loan was made was inaccurate, the loan is called. The loan is canceled. And so the fact here that the verification would happen in writing, said, you know, here's the information you provided us. We're going to give you a loan on these terms. We just need to verify that what you have told us borrowally is true, is a basic It does not make it any more conditional than even a loan that's already been made. Because so long as the information in writing matches the information given orally, there's a deal, or the deal remains, the promise remains. What's your response to Ms. McClendon's point that you have to have something specific in order to be able to rely on it? You didn't have a rate. You didn't have a term of months. You had some broad parameters, but those parameters were, I'm guessing, were probably came out of the HAMP program, as opposed to being a promise from Chase or SPS as to what kind of deal they were going to give them. Well, that's the point in Daniels, where Daniels references HAMP, and it says, and incidentally, we didn't just ask to amend to allege HAMP. The HAMP issue relates more specifically to the promissory estoppel claim. And we asked to be able to amend to allege more detailed facts with regard to the fraud. But HAMP, and there are many other programs, although in our opening brief we mentioned HAMP, there are in the reply brief. Since there's many programs, what's your response to Ms. McClendon's argument that your clients didn't have the specifics? Those specifics, when you take the terms of the loan and what the bank has said, and you plug them into the applicable programs, those determine the rates and the cost of the loan. Right, but you didn't, but that all remained to be done. None of that was done, which meant that your client could back out of this at any time. Your client could say, whoa, I was thinking I was only going to have to pay, you know, $3,000 a month, and now you're telling me it's going to be $3,800 a month, you know, for reasons that we don't wish to disclose to you. That's just not going to work for us. I mean, it just seems to me, every time I've gone for a house law, I want to know immediately, you know, if you're offering me 3-7-8 or 4-1-8, what's the difference between that? Is it $50 a month, is it $100 a month, is it $1,000 a month? All of that would make a difference to me as someone who wanted the loan. It would also make a difference to the lender. I mean, this works two ways, and if you have sort of an agreement to agree, that seems conditional. Right. I think this was more than an agreement to agree, because they were going to be bound by these specifics as applied through the lens of the laws that were regulating modifications at the time. So there's more specificity to this. Well, just a minute. When you say they were going to be bound by these specifics, what specifics are you talking about? The specifics in paragraph 14? In paragraph 14. Yeah. I mean, those are just parameters. They're not really specifics. They're just broad guidelines. But your folks didn't know how much what their payment was going to be. They didn't know what their rate was going to be. They didn't know what the term of months was going to be. I'm looking to see whether that's alleged. It's paragraph 14. Yeah. I'm looking at that. I'm also looking at the third promise. I think there's a question as to whether they were told anything more clearly than that. I mean, I see that these are parameters, Your Honor. But, again, I think it would be fair to allow them to give them the chance to amend. Just to clarify a little bit of the background. You think that they can come forward and tell us precisely what they were told about, how much they were going to be paying? I think they can come back and say more specifically. They never had that opportunity. That gets us to another question. We're well over our time. But the next question is, did you ever ask the district court for leave to amend? Your Honor, I don't know whether the briefing that was filed did so. It was submitted on the papers. And this was the first amended complaint, so you'd already amended once. Well, not in district court, to be clear. The original complaint was a very bare-bones complaint filed in the State court to get a TRO. Very, very basic. Then it was removed to district court where the first amended complaint was then filed to add the additional allegations that you would need to go forward. But as far as you know, you don't know of any place where the district court was ever asked to give leave to amend the complaint again. I'm not certain about that, Your Honor. Okay. All right. We've taken you well over your time. Thank you, Mr. Cipori. We thank all counsel for the argument. White v. J.P. Morgan Chase is submitted. The final case on the oral argument calendar is Daniel F. v. Blue Shield of California.
judges: Tashima, Bybee, Leitman